UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| JERRY R. HUFF | ) | |
| | ) | |
| V. | ) | NO. 2:15-CV-230 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff's application for Disability Insurance Benefits under the Social Security Act was administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. This is an action for judicial review of the Commissioner's decision denying benefits. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 31]. The defendant Commissioner has filed a Motion for Summary Judgment [Doc. 36], to which the plaintiff has replied [Doc. 45].

I.  **Standard of Review**

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the

reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence.  *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988).  Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

## II.    Sequential Evaluation Process

The applicable administrative regulations require the Commissioner to utilize a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
>
> 5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4).  A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.*, 109 F.3d 270, 274 (6th Cir. 1997).

2

In this case, the plaintiff has only applied for Disability Insurance Benefits, alleging that he became disabled on August 30, 2005. In order to be eligible for those benefits, he must show that he was disabled prior to the date his insured status expired on December 31, 2010, his "Date Last Insured" ["DLI"]. The ALJ found that the plaintiff was not under a disability at any time between August 30, 2005 and his DLI of December 31, 2010 (Tr. 15). *See* 20 C.F.R. § 404.130; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

### III. Evidence in the Record

The plaintiff was and is a younger individual. He has a high school education. He has past relevant work experience working for the City of Greeneville, Tennessee making and installing signage and painting parking lots and crosswalks. That job was classified as heavy vocationally and semi-skilled. He also worked as a welder which was classified as heavy and semi-skilled (Tr. 549).

The plaintiff presented very little medical evidence for the period prior to the expiration of his insured status, and much more from the time since his DLI of December 31, 2010. His history is recounted in his brief as follows:

> The relevant time period for proving Mr. Huff's disability is prior to December 31, 2010, the date he was last insured for disability insurance benefits. On 8/28/10 Mr. Huff was admitted to Laughlin Hospital complaining of chest pain and shortness of breath (Tr 301). Discharge diagnosis was "chest wall pain" (Tr 303). On 9/2/10 Mr. Huff saw his primary physician, Dr. Montgomery, for a post hospitalization checkup; Dr. Roberts ordered a series of laboratory tests and made a referral to a rheumatologist (Tr 524, 525). The lab results included Antinuclear Antibodies, CBC, Comprehensive Metabolic Panel, Lipid Panel, Rheumatoid Factor, Sed Rate, TSH, and Uric Acid and were basically normal except for Antinuclear Antibodies which was positive with a titer of 1:40 and a pattern of weak homogeneous. (Tr 510-514).
> On 1/19/2011 Mr. Huff saw Dr. Kauser, a rheumatologist, for the first time. Dr. Kouser stated that Mr. Huff was there "for evaluation of diffuse joint and muscle pain, which she (sic) has been experiencing for the last few months. Patient states that he would have some degree of pain intermittently associated

3

with some muscle spasms for the last several years, however, over the last few months or so he started having quite a bit of discomfort to multiple joints involving his wrist, his hands. He also has some pain to his hips, knees, ankles. This has been going on for the last four months or so." (TR 338) (italics added) Dr. Kouser noted the "slightly elevated ANA at 1:40 titer" and stated: "The concern was that he possibly could have inflammatory joint disease/rheumatoid arthritis/connective tissue disorder. Patient was referred for further evaluation and management of this condition." (Tr 338) Dr. Kouser's impression was: Inflammatory joint disease/psoriatic arthritis; rash most likely psoriasis; slightly elevated ANA, etiology significance unclear. (Tr 339) He stated: "It appears that patient mostly has psoriatic arthritis. He has a rash which gets worse in the cold weather. . . [that] has the appearance of psoriasis." He stated that he would "do a complete rheumatologic/serological workup", prescribed prednisone 10 mg and tramadol and advised Mr. Huff to continue taking meloxicam.

On 2/9/2011 Mr. Huff returned to see Dr. Kouser who reported his lab results as follows: elevated serum aldolase, high CPK level, positive pANCA level and a positive Lyme serology level at 1.39. His impression was: Elevated inflammatory muscle enzymes, etiology unclear; positive Lyme serology; sleep disorder and hypertension. (Tr 334) Mr. Huff continued seeing Dr. Kouser monthly; on 3/3/2011 the diagnosis was broadened to Diffuse arthralgias and myalgias and Inflammatory joint disease. Dr. Kouser added the medications hydroxychloroquine and doxycycline. (Tr 330).

Dr. Kouser referred Mr. Huff for a lumbar MRI which was done at Laughlin Hospital on 3/13/12; the report of the Lumbar MRI states that it was done for "Back Pain with Rt Radiculopathy". Impression was: "1) Moderate to severe central canal stenosis T11-T12 due to degenerative changes. 2) Right L3-L4 foraminal disk protrusion which touches the right L3 nerve root in the neural foramen. 3) Severe central canal stenosis at L3-L4 due to degenerative changes. 4) Moderate to severe L4-L5 central canal stenosis due to degenerative changes. 5) Severe left L5-S1 foraminal stenosis due to degenerative changes with impingement of the left L5 nerve root in the neural foramen." (Tr 267-268).

Dr. Kouser then referred Mr. Huff to Dr. Kent Sauter in Knoxville who saw him on 4/17/12 and reported that Mr. Huff described his pain as lower back radiating to right toes; no left leg pain; pain is constant (100% of time), burning, throbbing, dull, aching, numb; relieved by lying down; worse with bending. Mr. Huff stated that his lower back pain was a 5 out of 10 in severity and his right leg pain was a gradual onset since around October 2010 and also a 5 out of 10 in severity. (Tr 379) (italics added) Dr. Sauter stated he reviewed the 3/2012 Lumbar MRI and noted the following treatments had been tried: synthetic narcotics, NSAIDS, Steroids, Physical Therapy. (Tr 379) On exam a straight leg raising test was positive on the right. (Tr 380) Current medications were Lisinopril, Lortab, Lyrica, Mobic and Plaquenil. (Tr 379-380) When Dr. Sauter next saw him, he stated that an epidural injection had been tried and not helped. (Tr 376).

4

On 5/3/12 Mr. Huff was referred to Dr. Dennis Harris at the Advanced Spine & Rehab Center in Morristown. Dr. Harris's initial report states that Mr. Huff reported having symptoms of worsening back pain over the past one and a half to two years. "He describes deep aching throbbing low back pain, radiating hip pain, numbing and tingling sensations in the right lower extremity. He describes difficulty with prolonged standing, walking and bending." "He has been treated past year with Dr. Kouser with treatment for Lyme disease and treatment for inflammatory/rheumatoid arthritis. He is currently taking Plaquenil." (Tr 374).

Dr. Harris stated that Mr. Huff had tried the following treatments: Chiropractic care, exercise, ssteroids, heat, rest, ice, NSAIDs, pain medications and has had an exam by neurosurgery. (Tr 374) Dr. Harris stated that the lumbar MRI "document[ed] multilevel disc degenerative changes with severe canal stenosis at T11/T12, L3/L4, L4/L5, and L5/S1." (Tr 375) His diagnostic impression was "lumbar degenerative changes, multilevel canal and foraminal stenosis, chronic radiculitis and spondylosis." (Tr 375) He performed lumbar epidural steroid injections on 5/22/12 and 6/14/12 (Tr 370, 372).

On 8/27/12 Dr. Kouser saw him and at his request made an appointment for him to see Dr. David Wiles in Johnson City. The report of the initial visit on 9/27/12 states that Mr. Huff had undergone "a multitude of epidural steroid injections" which did not improve his symptoms for any extended period of time. (Tr 227) The report states that Mr. Huff presented with "mild low back pain but severe right lower extremity pain that seems to radiate through the right hip and buttock, extending through the hamstring, going arterially below the knee and into the great toe, consistent with an L5 distribution." Symptoms are worsened with activity and nothing causes improvement. (Tr 227) The 3/13/12 MRI was reviewed and the report states that it "demonstrates multilevel degenerative changes of the lumbar spine, most pronounced at the L3-4 and L4-5 segments. There are significant modic end plate changes at L3-4. There is moderate central canal stenosis at L3-4. Upon reviewing the parasagittal T1 cuts, he has severe foraminal stenosis on the right at L5-S1. This is best appreciated on Series 501, Images 4 and 5 where there is essentially complete obliteration of the neural foramen. Of note, there is also moderate stenosis at the T11-12 segment." (Tr 228).

Plans were made to perform a Lumbar Decompression and this was done on 10/19/12. The Operative Note describes the procedure as a Right L5-S1 partial laminectomy and partial facetectomy with wide foraminotomy and Right L4-5 partial laminectomy and partial medial facetectomy for decompression of lateral recess stenosis. (Tr 230-231) When Mr. Huff was seen in follow up on 12/13/12 the report states that he was continuing to have right leg pain "which seems to be more in an L5 pattern. He states that it feels like it is cold going into his leg and he still has tingling. It is of note that the patient has had symptoms for several years in the right leg. He has not had a recent EMG/NCS and I suspect that the patient may have developed chronic radiculopathy." (Tr 223).

An EMG/NCV Study on 12/20/12 showed "electromyographic evidence

5

of chronic right L5 radiculopathy with no denervations noted." (Tr 222) Mr. Huff returned to the clinic on 1/15/13 and the report of that visit states: "The surgery did not really relieve his pain at all." (Tr 219) Assessment was: Lumbar spine stenosis; Degeneration, lumbar/lumbosacral disc; Lumbosacral Neuritis NOS. The report states: "We feel at this point that, likely, because his nerves were compressed for so long, the patient now has chronic changes in his nerves." (Tr 220).

[Doc. 32, 3-7].

The evidence was reviewed by State Agency physicians Dr. John Mather and Dr. Thomas Thrush. Both found that the medical evidence was insufficient to assess the plaintiff's condition prior to the DLI, that plaintiff's activities of daily living were not pertinent to the time before his DLI, and that the claim was "technically insufficient." (Tr. 51, 60).

Plaintiff testified at his administrative hearing on April 2, 2014. He testimony is summarized in his brief as follows:

> Mr. Huff testified that in 2005 he was having problems performing his last job as welder, that he was seeing a chiropractor and taking Ibuprofen with little relief. He testified that prior to 2010 he was having numbness in his right leg and pain in his right hip and foot and pain and swelling in his knees, elbows and shoulders (Tr 35, 36) and that he was ultimately diagnosed with rheumatoid arthritis (Tr 36). He testified that he was having stiffness in his neck, back and shoulders that was worse in the morning: "Morning is real bad." (Tr 37) He testified that he started seeing a rheumatologist in January 2011, that pain medication was prescribed but did not help much. (Tr 37) He testified that he had back surgery in 2012 and that after that, his leg is "permanently numb". (Tr 38) He testified that in 2010 he was having symptoms from lyme disease that was undiagnosed at the time. (Tr 39) He testified that in 2010 he could carry a gallon of milk but was not able to lift it all day long and was not able to lift and carry it for a couple of hours at a time. He testified that he was not able to stand for four hours at a time in 2010 but probably could have with "breaks to sit down every so often" but when asked by his representative if he could have done that again the next day, he answered that he did not know if he could have done that. (Tr40) His representative asked him about his ability to walk in 2010 and he said that his problem with walking affected his ability to coon hunt and that he probably last coon hunted before his surgery in 2012 but "couldn't do much of it then" and it would have been for a couple hours at most. (Tr 41) He testified that in 2010 he would have to hold on to the buggy when grocery shopping with his wife. He

6

testified that he didn't file for disability benefits sooner because "I didn't think I could get it." (Tr 41) He testified that it would have been difficult for him to sit for six hours in an 8-hour workday in 2010. (Tr 42).

[Doc. 32, 2-3].

Also testifying at the hearing was Dr. Robert S. Spangler, a vocational expert ["VE"]. After describing the exertional requirements of plaintiff's past relevant work described above (Tr. 549), the ALJ asked Dr. Spangler several "hypothetical" questions. After asking the VE to assume a person of the same vocational characteristics as the plaintiff, the ALJ asked him to assume "this person could do medium work (lifting 25 pounds frequently and 50 pounds occasionally), occasional postural, no ropes, ladders, scaffolds, avoid concentrated exposure to hazards, and concentrated exposure to vibrations, limited to simple, unskilled work." When asked if there would be jobs, Dr. Spangler stated there would be 60% of 1,411,225 jobs in the nation and 60% of 33,574 jobs in the State of Tennessee such a person could perform (Tr. 549-550).

The ALJ then changed the hypothetical to limit the person to light work (lifting 10 pounds frequently and 20 pounds occasionally with walking up to 6 hours) with the same restrictions as the first question. The VE stated at that level there would be 60% of 2,252,702 jobs in the nation and 60% of 42,159 in the state that person could perform (Tr. 550).

The ALJ then changed the hypothetical to sedentary work (lifting no more than 10 pounds and involving mostly sitting) with the same previously identified restrictions. The VE stated there would be 80% of 163,379 jobs in the nation and 80% of 3,481 in the state which that person could perform (Tr. 550-551).

Finally, the ALJ asked if there would be any jobs if the plaintiff's hearing testimony was

7

Case 2:15-cv-00230-JRG-MCLC   Document 46   Filed 02/14/17   Page 7 of 18
PageID #: 1258

"true and correct." The VE stated that in that case there would be no jobs (Tr. 551).

## IV. ALJ's Findings

1. The plaintiff last met the insured status requirements of the Social Security Act on December 31, 2010. Since the claim was only for Disability Insurance Benefits, it was thus imperative that the plaintiff establish that he was disabled prior to that date (Tr. 11).

2. The plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of August 30, 2005 through his date last insured of December 31, 2010 (Tr. 11).

3. Through the DLI, the plaintiff had medically determinable impairments of arthralgias, lumbago, and high blood pressure (Tr. 11).

4. Through the DLI, the plaintiff did not have an impairment or combination of impairments that significantly limited the ability to perform basic work activities for 12 consecutive months; therefore, the plaintiff did not have a severe impairment or combination of impairments. The ALJ discussed the requirements of Social Security Ruling ["SSR"] 85-28, 1985 WL 56856. That ruling states, in part, that

> [a]n impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

*Titles II & XVI: Med. Impairments That Are Not Severe*, SSR 85-28, at *3 (S.S.A. 1985). The ruling goes on to say that "[t]he severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs.

8

Examples of these are walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." *Id.* (Tr. 11-12).

In making this finding, the ALJ recounted the plaintiff's hearing testimony. He noted that the plaintiff stated that in 2010, "he was not able to sit six hours in an eight-hour day" and that he had to lean on a buggy when at the grocery store (Tr. 12). He then discussed the December 2012 Function Report completed by plaintiff (Tr. 12). He also reviewed the statement by the plaintiff's wife dated December 2013 about the various things plaintiff could no longer do (Tr. 12).

The ALJ then stated that, as part of the process of considering the plaintiff's symptoms, it was necessary for him to evaluate the plaintiff's credibility (Tr. 12-13). He then discussed the pre-DLI medical evidence. This included plaintiff's August 11, 2005 hospitalization for chest pain and elevated blood pressure, which was resolved with the plaintiff being discharged in improved condition. He discussed visits to Dr. Hamilton, plaintiff's chiropractor, noting that those visits were in May 2004, September 2006, May 2007, August 2007, and September 2007. He stated that plaintiff had a good range of motion in all joints, 5/5 strength in his extremities, and normal gait. The ALJ noted that treatment plaintiff received had "overall positive results." (Tr. 13). He stated that plaintiff did not return to see Dr. Hamilton until June 2009, when he complained of tightened muscles with a limited range of motion, but that by July 2009, the plaintiff's pain had decreased (Tr. 13).

The ALJ noted that the plaintiff was seen in the ER with left wrist pain after falling from a ladder which resulted in a left wrist fracture. After surgery to repair the fracture, no further

9

treatment was needed (Tr. 13).

The ALJ noted that the only other pre-DLI treatment was in September 2010, by Dr. Montgomery for bilateral shoulder pain and high blood pressure. The ALJ stated that plaintiff was treated with medications with no significant problems (Tr. 13).

Based on this evidence, the ALJ found that the plaintiff's statements about the intensity, persistence and limiting effects of these symptoms were not credible prior to his DLI, December 31, 2010. Regarding plaintiff's musculoskeletal problems, the ALJ noted that the treatment prior to the DLI was conservative, did not involve surgery, did not involve seeking treatment from a spine or pain specialist, or hospitalizations. He stated that the symptoms were well controlled with appropriate treatment, and that there was no indication that the impairments resulted in more than mild impairments of functioning. Also, the ALJ noted the significant gaps in treatment during the pre DLI period (Tr. 14).

The ALJ then stated that "[w]hile the record contains medical evidence supportive of severe impairments subsequent to the date last insured, the undersigned finds that the record fails to indicate that such impairments were present at a severe level prior to the date last insured, or even resulted in more than mild limitations. Further, the record contains no evidence during the relevant period showing that the claimant was significantly limited in his daily activities. (Tr. 14).

The ALJ then stated that he had considered the reports and findings of all the doctors who treated plaintiff prior to his DLI. He gave great weight to the State Agency doctors who opined that the record failed to show a severe impairment prior to the DLI. He then said that he had considered the plaintiff's testimony, his above-mentioned Function Report, and the statement of plaintiff's wife. He stated then that "such reports were based on the claimant's current medical

10

situation and did not apply to the claimant's medical situation during the period at issue, August 30, 2005 to December 31, 2010 (date last insured)." (Tr. 14-15).

The ALJ also at this point made an alternative finding that "even if the claimant was limited to light work that involves no more than occasional postural, no climbing ropes/ladders/scaffolds, and no concentrated exposure to hazards (height, machinery, etc.) and vibrations," the VE identified a significant number of jobs in the state and national economies that the plaintiff could perform (Tr. 15). Therefore, the ALJ found that the plaintiff was not disabled through his date last insured (Tr. 15).

## V. Analysis

Plaintiff first argues that the ALJ erred "in not following her own rules and regulations in considering the determination of disability onset." [Doc. 31-1, pg. 7]. He asserts that SSR 83-20 sets forth the process the ALJ must follow in establishing the onset date of disability. As pointed out by plaintiff, that ruling states that "determining the proper onset date is particularly difficult when for example the alleged onset date and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomology of the disease process." *Id*. pg. 8.

Plaintiff asserts that the ALJ did not even mention SSR 83-20. Likewise, plaintiff points out that the ALJ did not mention Dr. Kouser, and the fact that plaintiff first went to see him on January 19, 2011, less than 3 weeks after the DLI. Pointing out that SSR 83-20 states that an ALJ may have to make an inference as to when disability began, "it can easily be inferred that Mr. Huff's condition on January 19 as described by Dr. Kouser is the same as it was on December 31,

11

especially when Dr. Kouser's treatment note states that Mr. Huff was there for evaluation of diffuse joint and muscle pain which Mr. Huff stated he had been experiencing for the last few months" [Doc. 31-1, pgs. 8-9].

SSR 83-20 says that "[t]he onset date of disability is the first day an individual is disabled as defined in the Act and the regulations." *Titles II & XVI: Onset of Disability*, SSR 83-20, 1983 WL 31249, at * 1 (S.S.A. 1983). Obviously, this ruling requires the ALJ to determine the onset of disability date. However, it also requires that the plaintiff in fact be found to be disabled. In the present case, the ALJ never found that the plaintiff was disabled at any time, either when he was still eligible for Disability Insurance Benefits prior to December 31, 2010, or at any time thereafter. Had he found that the plaintiff was disabled as defined in the Act, it would have been necessary for him under SSR 83-20 to determine an onset date from the best evidence he had available.

Plaintiff relies on *Willbanks v. Secretary of H.H.S.*, 847 F.2d 301 (6th Cir. 1988). That case dealt with a circumstance in which there was no dispute that the plaintiff had been found disabled by the District Court, and the case had been remanded *solely for the purpose of determining the onset date*. The ALJ in that case found that the plaintiff was disabled as of January 1976, while he was still insured, based upon plaintiff's testimony, that of his mother, and various doctors. The record showed that the plaintiff had "real bad emotional problems" which were aggravated by abuse of alcohol and drugs. *Id*. at 302. Both a consultative psychiatric examiner and a treating psychiatrist opined that he became disabled in either 1975 or 1976, as the consultative examiner put it "after about a year of heavy daily drinking." *Id*. at 302.

On appeal, the Appeals Council reversed the ALJ and found that plaintiff's disability

12

commenced in June 1982, the date he had first sought treatment. The District Court agreed and plaintiff appealed. The Commissioner argued that if Willbanks was as sick as he claimed to be, he would have sought treatment sooner. The Sixth Circuit held that "[l]ooking at the record as a whole, however, we cannot conclude that substantial evidence supports the Secretary's conclusion." *Id*. at 303.

Instead, the Sixth Circuit felt that the "the ALJ's opportunity to observe the demeanor of Willbanks…to evaluate what (he) said in light of how (he) said it, and to consider how it fit with the rest of the evidence was invaluable and should not have been discarded as lightly as the Appeals Council discarded it." *Id*. at 303. The Court went on to say that "[t]he Appeals Council's decision did not adhere to SSR 83-20." *Id*. at 304.

*Willbanks* thus defends the ALJ for acting as the finder of fact, but also, as stated above, it was a given that the plaintiff was incapable of any substantial gainful activity at some point. It was the sole function of the ALJ to determine when. In the present case, the ALJ as finder of fact did not find that the plaintiff reached that status at any point in time, even though he did find that his impairments eventually became "severe" at some point after his insured status expired. In spite of this, by making the alternative finding that jobs existed in significant numbers that the plaintiff could still perform, he implicitly found that the plaintiff was not disabled, and that the plaintiff did not even establish that he had a severe impairment prior to his DLI. Therefore, the Court does not believe that SSR 83-20 applies in the present posture of this case. There is also an arguable factual distinction between an alcoholic not admitting he has a problem and failing to seek treatment, and a person with alleged back pain not seeking appropriate treatment sooner rather than later.

13

Plaintiff does point to the fact that the plaintiff went to Dr. Kouser just 19 days after his insured status expired, and began a course of treatment which ultimately led to a lumbar MRI in March 2012, and back surgery in October 2012. Generally, "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Comm. Of Soc. Sec.*, 88 Fed. App'x 841, 845 (6th Cir. 2004). However, with Dr. Kouser's treatment beginning so soon after the DLI, it could raise a question as to whether the plaintiff at least had a severe impairment while still in insured status, which, if that were the case, could have required the ALJ to proceed beyond Step Two of the evaluation process.

The Commissioner states the case of *Seeley v. Commissioner of Soc. Sec.*, 600 Fed. App'x 387 (6th Cir. 2015) is applicable on this point. In *Seeley*, the plaintiff claimed a disability onset date of June 2, 2000. The medical record prior to the date his insured status expired on June 30, 2001 was sparse. *Id*. at 388. Other than noting a history of hypertension, none of those records was germane to the conditions he claimed entitled him to disability. *Id*. Mr. Seeley went to see a doctor five days after his insured status expired and was diagnosed with various conditions even though the examination showed no abnormal results. For several years, the plaintiff visited various doctors who noted his problems but stated he was doing well on medications. *Id*. With no further medical records after 2004, plaintiff applied for benefits in 2008. In 2011, two of his treating sources opined that the plaintiff had conditions with supposed disabling levels of impairment and that they were at that level of severity prior to his insured status expiring 10 years before. *Id.* at 389. The ALJ found that the plaintiff did not have a severe impairment that precluded him from performing basic work activities prior to the expiration of his insured status.

The Court found that the record supported the ALJ's decision. *Id*. at 390. The Court

14

noted that while the record showed the plaintiff had diabetes and depression before and immediately after his DLI, the doctor's reports contained no information about the physical limitations or intensity of pain associated with the conditions. *Id*. Those records from that time period did not show that plaintiff was unable to perform basic work activities. Therefore, the Court found that the ALJ's determination that he did not have a sever impairment prior to his insured status expiring was supported by substantial evidence. *Id.* at 391.

      The Court believes there are important distinctions between this scenario in *Seeley* and the case at bar. The medical records before the ALJ in *Seeley* did not suggest a severe impairment, including records from several years following that plaintiff's DLI. Also, the opinions of the doctors generated over a decade after the DLI did not document or discuss "complaints of symptoms" prior to the DLI. *Id.* In the present case, Dr. Kouser noted rather serious musculoskeletal problems in plaintiff's first visit, a mere 19 days after plaintiff's DLI, which plaintiff stated had been going on for the last four months prior to that visit. (Tr. 338). Also, the diagnostic process and treatment continued on a regular basis as outlined hereinabove in the recitation of the medical evidence until the plaintiff had his surgery in October 2012.

      A primary difference in the present case is that the ALJ did not discuss any of the medical history after the plaintiff's DLI except to say that at some point thereafter the plaintiff apparently had severe impairments. In *Seeley*, the ALJ discussed all of the evidence, so it was clear to the Court what his impressions and findings were. This makes the determination of whether the ALJ's rejection of plaintiff's claim is supported by substantial evidence much more difficult than it needs to be.

      However, the ultimate issue is not whether the plaintiff had a severe impairment prior to

15

December 31, 2010, but whether there is substantial evidence that he was, in fact, *disabled* prior to that date. One piece of evidence which cannot be ignored is Dr. Kouser's treatment note from April 8, 2011 (Tr. 326). In that report, Dr. Kouser states that "since his last visit (plaintiff) seems to have done better. He still continues to have some discomfort to his knees, some to his hands, but he states that overall he is feeling better and is not having as many symptoms." (Tr. 326). The doctor discusses the plaintiff's medications. He notes some restriction of the cervical spine in the lateral planes, but that plaintiff has a good range of motion in his hips. He states that the plaintiff's lab work was mostly unremarkable. He stated that the plaintiff had inflammatory joint disease/inflammatory muscle disease, arthralgias, myalgias and hypertension. He gave plaintiff refills of his medications and scheduled a follow-up visit "in about two months." (Tr. 326).

This treatment note, dated over three months after the plaintiff's insured status expired, appears to certainly describe a person with a severe impairment. However, it does not appear to describe a person who is completely disabled from all substantial gainful activity. Thus, it is substantial evidence that the plaintiff was not disabled as of April 8, 2011, and thus could not have been disabled on or before his DLI. In point of fact, the Court cannot say that the plaintiff was ever disabled at any time thereafter given the fact that the VE identified both light and sedentary jobs in significant numbers. Whether he ever became disabled or not would require further evaluation by the ALJ of the undiscussed post-DLI evidence. However, since there is substantial evidence that he was not disabled when *he had to be* in order to be eligible for Disability Insurance Benefits, there is no need for a remand.

The Court also notes that it was not until 11 months later, in March 2012, that the MRI was ordered. Plaintiff did not have an injury during the time he was insured marking a clear

16

demarcation between being able to work and being disabled. Instead, he had at best a gradual but progressive onset of back pain. Also, even considering all of the evidence after the DLI in its best light, it is certainly not clear that he ever became disabled. For all of these reasons, the Court finds that the plaintiff failed to prove that he became incapable of substantial gainful activity before his DLI of December 31, 2010.

The Court finds no fault with the ALJ's evaluation of the plaintiff's credibility. Plaintiff insists that the only reference to plaintiff's credibility was the ALJ's statement that he was not credible. However, in the paragraphs following that statement, which plaintiff asserts was mere boilerplate language, the ALJ specifically discusses the conservative nature and timing of treatment and the positive effects medications had on his conditions (Tr. 14-15). These are clear indications of why the ALJ did not find the plaintiff to be entirely credible. Also, the Court notes plaintiff's claim was not filed until almost two years after his insured status expired. His testimony at the hearing was over three years after his DLI. These facts would also support the ALJ doubting the reliability of the symptoms he was feeling prior to his insured status expiring. However, even if the ALJ did not properly explain his rationale in this regard, any such error was harmless in light of the fact that the Dr. Kouser's record described above indicates the plaintiff was not disabled for some period of time after his DLI.

Finally, the ALJ did not err in making his alternative finding that there would have been a substantial number of jobs the plaintiff could have performed. Even if the plaintiff had severe impairments prior to the expiration of his insured status, there is no evidence that he could not have performed a limited range of sedentary or even light work during that time period. The VE identified a significant number of such jobs (Tr. 549-551).

17

The Court sympathizes with the plaintiff.  However, an individual's DLI is a fixed point in time, and there is substantial evidence that the plaintiff could have engaged in substantial gainful activity up to and after December 31, 2010.  There is also a lack of any objective medical evidence that the plaintiff was disabled prior to the DLI.  Any error in finding that the plaintiff was not completely credible was harmless because of the existence of objective medical evidence that he was not disabled even after his DLI.

Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 31] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 36] be GRANTED.[1]

Respectfully submitted,

 s/ Clifton L. Corker
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived.  28 U.S.C. 636(b)(1).